682 P.2d 99

**UNITED STATES DEPARTMENT OF ENERGY, Appellant,**

v.

**IDAHO PUBLIC UTILITIES COMMISSION, Respondent.**

No. 14882.

Supreme Court of Idaho.

May 25, 1984.

Guy G. Hurlbutt, Boise, Idaho, Betty L. Hollowell, Idaho Falls, Idaho, for appellant.

Jim Jones, Atty. Gen., Jonathan M. Duke II, Deputy Atty. Gen., Boise, Idaho, for respondent Idaho Public Utilities Com'n.

Wesley F. Merrill, Pocatello, Idaho, for intervenor Utah Power & Light Co.

BISTLINE, Justice.

On March 1, 1982, Utah Power & Light Company (UP & L) requested authority from the Idaho Public Utilities Commission (Commission) to increase its annual revenues by 29.1%, or $23,762,000.00. The United States Department of Energy (DOE) petitioned to intervene on April 14, 1982. On September 27, 1982, the Commission determined UP & L's additional revenue requirement to be $12,935,000.00, reflecting an increase in rates of 15.43%. The rate increase was allocated uniformly

to all classes, including DOE, which is considered an individual class, with the exception of Monsanto Company. DOE filed a petition for rehearing which was denied. The Commission, in denying rehearing, reduced the charges assessed to DOE to equal those assessed to Monsanto.

This dispute ultimately evolved from two contracts entered into in 1957 to assure that the power needs of the Nuclear Reactor Testing Station (presently called the Idaho Nuclear Engineering Laboratory) in southeastern Idaho were met. On February 4, 1957, the Atomic Energy Commission (AEC), predecessor to DOE, entered into an agreement with UP & L for the purchase of up to 40,000 kilowatts of power. This agreement superseded a 1950 agreement for the supply of up to 20,000 kilowatts of electric power. The 1957 agreement (hereafter the three-party agreement) provided that the "Buyer now desires to contract, to the extent hereinafter specified, for an additional supply of electric power which Seller [Idaho Power], *in cooperation with Utah Company,* is willing to supply to Buyer for the operation of its National Reactor Testing Station in Butte, Jefferson and Bingham Counties in southeastern Idaho." Ex. 36, p. 1, art. 0.2 (emphasis added). The agreement further provided that "the successful operation of NRTS requires a dependable supply of firm electric power in an amount greater than that provided under 1950 Agreement; ...." Ex. 36, p. 2, art. 0.4. The agreement was entered into in the interest of the "common defense and security." Pursuant to the contract, the AEC would file a "contract demand" schedule for each year which Idaho Power, in conjunction with UP & L, would be committed to supply or stand in readiness to supply, limited to 40,000 kilowatts of power per month.[1] The AEC was to be assessed

"(i) charges for readiness-to-supply;[2] (ii) charges for power and energy actually taken by Buyer; and (iii) charges for kilovars taken by Buyer in accordance with the provisions of paragraph 6.3, above. *The readiness-to-supply charges are to be paid by Buyer irrespective of whether Buyer takes or does not take the amount of power which Buyer is entitled to take hereunder.* The foregoing charges, of the three classes enumerated, are additive." Ex. 36, p. 25, art. 8.1 (emphasis added).

AEC was given the right to terminate the contract at any time upon the delivery of six months notice to Idaho Power. Ex. 36, p. 31, art. 9.1.

On February 5, 1957, the day after the AEC, Idaho Power and UP & L[3] entered into the three-party contract, Idaho Power and UP & L entered into a second contract (hereafter the two-party contract) which defined "the respective responsibilities of Idaho Company and Utah Company in connection with supply of power and energy to AEC under the AEC 1957 Agreement." Ex. 37, p. 1, art. 2.1. Pursuant to this contract, UP & L agreed that it would "(i) do all things which are provided in AEC 1957 Agreement to be done by Utah Company, (ii) assume responsibility for supply of power and energy for AEC to the extent provided in this agreement and (iii) cooperate fully with Idaho Company in all appropriate measures to insure reliability in power supply to AEC." Ex. 37, p. 2, art. 3.1. The contract provided that "Utah Company will furnish, or stand in readiness to furnish, to Idaho Company or supply to AEC the amounts of power and energy specified in Section 6 hereof as Utah Company's billing demand assignment and energy assignment." Ex. 37, p. 4, art. 5.1. UP & L's billing demand assignment was defined

1. The contract provided that the Buyer could substitute new or superceding contract demand schedules by filing written notice with Idaho Power subject to several listed conditions. Ex. 36, p. 13, art. 5.1(c).

2. Charges for readiness-to-supply were based on "billing demand," art. 8.2, which was defined as

"the Contract Demand specified for that month in the schedule in effect at that time, or the Actual Demand, *whichever is greater.*" Ex. 36, p. 15, art. 5.3 (emphasis added).

3. AEC, Idaho Power and UP & L were all signatories to the three-party contract.

as "one-third of the AEC monthly billing demand." Ex. 37, p. 5, art. 6.2. Idaho Power was to provide the full amount of energy actually demanded by AEC "in case the AEC actual demand should be less than, or be equal to, two-thirds of the AEC billing demand; ...." UP & L's actual demand assignment was set at that amount by which AEC's actual demand exceeded the two-thirds billing demand assigned to Idaho Power.

In 1967, DOE renewed the three-party contract with Idaho Power and UP & L. UP & L has not provided electricity to DOE since 1978. However, in 1981, the three-party contract demand was set at 33.5 megawatts for each month until December of 1981, at which point it was reduced to 31 megawatts. Thus, under the two-party contract, UP & L was allocated 11.3 megawatts of DOE demand for 1981. UP & L has charged DOE, pursuant to the provisions of the two-party contract, for the full 11.3 megawatts of energy which it holds in readiness-to-supply DOE.

DOE argues that the Commission erred in subjecting it to a rate increase based upon the two-party contract to which it is not a party, rather than upon actual use or the amount of plant devoted to its service. DOE argues that the Commission improperly ignored evidence that UP & L has provided no electricity to DOE since 1978 and will not in the foreseeable future be called upon to provide any electricity to DOE and that under the Commission's decision herein, it will be required to pay UP & L approximately $1,200,000 per year; that Idaho Power has fulfilled all of DOE's electrical requirements and that it allocates costs to DOE on the same basis as all of its firm, full requirements customers; and that UP & L bases the demand which it allocates to all of its customers other than DOE on their actual demand, but bases DOE's cost allocation upon DOE's theoretical demand.

We are not persuaded that UP & L improperly allocates costs to DOE based on one-third of its billing demand pursuant to the two-party contract. The three-party contract was entered into between the AEC, Idaho Power and UP & L. The contract envisioned that Idaho Power and UP & L would act jointly, in cooperation, in furnishing the energy needs of the National Reactor Testing Station. The AEC, acting in the interests of common defense and security, sought to *insure* that it would receive dependable firm power and chose to do that by contracting with two utilities for a fixed amount of power for which it would pay whether or not it was actually used, *i.e.*, readiness-to-supply energy. AEC specified and agreed that the two utilities should cooperate in this endeavor, but did not list the terms of that cooperation in the three-party contract itself. What the AEC did specify in the three-party agreement was that it would pay a certain rate for a specified number of kilowatts per month, such kilowatt level to be set by AEC annually. UP & L and Idaho Power had no power to alter AEC's obligations under the three-party contract in a later agreement; they merely had the right to define their own respective obligations within the parameters of the three-party agreement.[4] This is exactly what they did. They divided the total number of kilowatts for which they were jointly responsible under the three-party agreement, and each agreed to be individually responsible for supplying a fixed percentage of the kilowatt hours annually scheduled by AEC. AEC, now DOE, annually defined the limits of its

---

4. In *United States v. Utah Power & Light Co.*, 98 Idaho 665, 667, 570 P.2d 1353, 1355 (1977), this Court recognized the interplay between the three-party contract and the two-party contract entered into between Idaho Power and UP & L:

"The anticipation of the parties to the transaction was that Idaho Power would not be able to satisfy ERDA's [United States Energy Research & Development Administration] energy demands by itself. Utah Power was therefore included in the agreement to provide an additional energy source. With the exception of the rates at which both actual and standby energy would be provided, the specifics of its obligations to ERDA were not set forth in the agreement. It is undisputed, however, that Utah Power provided actual energy to ERDA and maintained an energy reservoir to satisfy ERDA's standby demands."

obligations under the three-party contract by establishing the total number of kilowatts for which it would pay, whether or not it actually used them. DOE held the right to modify its contract demand as well as to terminate the three-party contract altogether. The two-party agreement did not enlarge or affect DOE's obligations under the three-party agreement. DOE is not now forced to pay anything additional to that which it obligated itself for under the three-party agreement. Its total payments to the two utilities under the two-party contract are no greater than those agreed to under the three-party contract.[5] The mere fact that it pays UP & L a readiness-to-supply charge when its actual use is zero is irrelevant. It has contracted for, and is obligated to pay for the greater of the contract demand or usage. Having freely entered into the three-party agreement which outlined its obligations, DOE will not now be heard to complain that such is not fair, particularly when it is free to terminate the aforesaid contract at any time.

The order is affirmed.

DONALDSON, C.J., BAKES, J., and WALTERS, J. pro tem, concur.

SHEPARD, J., concurs in the result.

---

5. The fact that Idaho Power has chosen to base DOE's rates on less costly actual use rather than on the greater contract billing demand does not affect UP & L's *right* under the two-party contract to assess costs based on the contract billing demand.